KYLER & WIFE
*vs*
DUNLAP.

mode, (*Code of Prac. sec.* 56,) and a guardian *ad litem* appointed and defense made. (*Code of Prac. sec.* 55.)

---

## Kyler and Wife *vs.* Dunlap.

Case 16.

Pet. Eq.

1. By the *Rev. Statutes, art.* 1, *chap.* 93, *page* 628, free negroes cannot hold in fee, or for any length of time as hirer, any slave, "other than the husband, wife, parent, or descendant of such free negro."
2. The wife of a free negro is liable to sale under execution against the husband for his debts.
3. A constable may sell slaves under execution, emanating from justices of the peace.

KYLER & WIFE
*vs.*
DUNLAP.

[The facts of the case are set out in the opinion of the court.—REP.]

*A. A. Burton,* for appellant—

Argued—1. That under *section* 6. *art.* 1, *chap. XCIII, Rev. Statutes,* 628, which is in these words; "No free ' negro shall be capable of acquiring in fee, or hold- ' ing or owning for any length of time, as hirer or oth- ' erwise, any slave, other than the husband, wife, pa- ' rent, or descendant of such a free negro;" a free negro can acquire no property in a slave.

The portion of the section quoted, which permits the acquisition by a free negro of his or her slave husband, wife, parent, or descendants, is a departure from the general policy of the state, in regard to the institution of slavery. The privilege is a humane and beneficent exception, in favor of an unfortunate class of human beings, granted by the law-making power, out of respect to sympathies, affections, and natural ties common to the whole human race; and its operation and benefits being restricted to those bearing certain relations to each other, the necessary inference is, that the prime and sole object of the legislature was to secure and protect those re- lations with all their incidents. That the freed hus- band, wife, parent, or descendant might rescue from slavery and raise from the condition of a mere chat- tel, to that of a person, his or her less fortunate rel- ative; and not that he or she might acquire a prop- erty and transmissible right in the object of legisla- tive favor.

The general rule of policy enacted is, that free ne- groes shall be incapable of acquiring, holding, or owning any slave, except those sustaining the rela- tions specified; and the protection of these relations from the operation of the general rule, being the on- ly object intended to be effected by the exception, there could consequently have been no purpose for conferring any greater power than that necessary to attain the end desired—to permit the acquisition as

husbands, wives, parents or descendants. The power to acquire, hold, or own generally, is each disjunctively denied in the prohibitory part of the section; but the permission to do either is sufficient to effect the design of the exception; and the power to acquire or hold being more in consonance with that object, it is presumable that no other was intended or given; for one may acquire or hold for a particular and limited purpose, and not own—the first two being only initiatory to the latter. Were it otherwise, the peculiar condition of the slave would in most instances render nugatory the benevolent design of the legislature. A husband would redeem his wife from servitude, only to be his slave and rear an offspring by her, not his children, to succeed to his estate, but his property, following the condition of their mother, to be sold with her into slavery by his administrator, upon his dying intestate, and their price go into the public treasury by escheat, in case he should leave no free relation capable of inheriting from him. Or, a husband given to his free wife by a kind master, or purchased by her with the earnings of years of night toil, may be seized the next moment by a merciless creditor, whose debt has lain dormant for years, or from cupidity, or in a fit of jealous passion, sold by her, and remanded back to slavery. Consequences so absurd, and so utterly subversive of the benign aim of the framers of the law, and yet so palpably inevitable, could not have escaped their scrutiny.

2. Joseph Kyler, as the fee simple owner of Cynthia, had the power to dispose of her absolutely or conditionally, or for any length of time or purpose allawed by law. The law recognizes marriage between free negroes, with all the rights and incidents of a marriage between white persons. (*Free Frank and Lucy vs. Dunham*, 5 *Littell*, 330; *Stover vs. Boswell*, 3 *Dana*, 233.) And by consent of their owners the relation may be entered into by slaves. (*Girod vs. Lewis*, 6 *Martin's Louisiana Rep.* 559.) The pur-

pose then, being lawful, the nature and character of the relation between Stephen and Cynthia was fixed by the intention of Joseph Kyler and Stephen, with the moral assent of Cynthia, and consequently, Stephen's right in, and power of control over her, are limited thereby; and it being the understanding and agreement between all the parties, that he should take her as a wife only, he acquired no property in her, aside from his right as husband, to her comfort and society. Joseph Kyler parted with, and Stephen has claimed no greater right, and it certainly cannot be contended with any show of plausibility, that one can be forced to be an owner and proprietor against his will.

3. But it is objected, that inasmuch as the terms in which the gift to Stephen is written, are absolute and without qualification, it is a fraud on his creditors for him to claim her but as a wife. What, a fraud for a man not to make his wife a slave? Can the forbearance to do such an act, be tortured into a fraud upon the right of any one, much less, upon the rights of a creditor who did not trust him on the faith of her being his property, but whose debt was created while she belonged to another man? If this be so, we are of a certainty, realizing in the severest, and a practical form, one of the effects of that barbarous and piratical doctrine of the Dred Scott decision, "that negroes have no rights that we are bound to respect." Truly, then, has that African Adam, in his attempt at the forbidden fruit of freedom, brought worse than sin and death to the negro race. But while some of the miniature *Storys and Marshalls* of the present day, have bowed their heads in meek submission to the senseless clatter of cross-road constable politicians, and defiantly repudiated the hallowed memories of the great lights that have gone before them, I submit this case with the fullest confidence that the appellants have rights to be respected in this court, not doubting, but its members will discharge

fearlessly and with sacred fidelity, the high trust confided to them by an enlightened and humane public sovereignty.

A reversal is asked.

*Geo. R. McKee,* for appellee—

1. When the *status* of slavery once attaches it remains until removed by certain forms prescribed by law; every person is either a freeman or a slave. An individual may owe service to another for a limited period, yet be a free person—as apprentices, &c. These duties and obligation for performance are not transferrable. (*Davenport vs. Gentry's admr.* 9 *B. Monroe,* 429.) If one originally a slave be entitled to freedom at a future period, the time of service may be sold until the event on which the right depends shall arrive. (*Ned vs. Beall,* 2 *Bibb,* 298; *Jameson vs. Emeline,* 5 *Dana,* 589; *Johnson's admr. vs. Johnson's heirs,* 8 *B. Monroe,* 471.)

2. Cynthia was the slave of Joseph Kyler; he did no act by which she would, at any future period, be entitled to freedom; he sold her as a slave; in the hands of the purchaser she was liable to sale for his debts.

3. It was not the intention of the legislature, by making provision for the purchase of a slave who was the husband, wife, parent, or descendant of the colored person who might be the purchaser, to set free such person. Such a construction would be against the policy of the law, and in conflict with its meaning' and therefore should not be adopted. (*Broome's Maxims, Law Lib. vol.* 50, *side page* 243, and authority there cited; *Conclude vs. Williamson's admr.* 1 *J. J. Marshall,* 16.)

Chief Justice WHEAT delivered the opinion of the court.

Dunlap sued out executions of *fieri facias* from the office of a justice of the peace, upon two judgments which he had recovered against the appellant, Stephen Kyler, a free man of color. These executions

KYLER & WIFE
*vs.*
DUNLAP.

Dec. 23, 1857.

KYLER & WIFE
*vs.*
DUNLAP.

were placed in the hands of Arnold, a constable, who levied them upon the appellant, Cynthia Kyler.

Stephen and Cynthia Kyler filed their petition in equity against Dunlap and Arnold, and obtained an injunction inhibiting the sale of Cynthia under the executions. The petition avered, in substance, that one Joseph Kyler, who had once owned Stephen, and manumitted him, purchased Cynthia because she was the wife of Stephen, and being desirous to secure to Cynthia her freedom after his death, consulted a lawyer on the subject of emancipating Cynthia, who was unwilling to leave this State, and having been advised by the lawyer that under the existing constiution of Kentucky Cynthia could not be emancipated and remain in this state; and the lawyer having advised Joseph Kyler that the only way he could secure Cynthia to Stephen for a wife, whilst she remained in Kentucky, was to make a bill of sale or deed conveying her to Stephen, to be held by him as a wife.

A deed expressing a nominal consideration, was executed by Joseph Kyler to Stephen Kyler, conveying Cynthia to Stephen in fee, after reserving a life estate to Cynthia in the grantor, and the deed was regularly recorded in the office of the clerk of the Garrard county court. The deed contains a clause stipulating for a warranty, by the grantor, to Stephen against all claims to Cynthia.

Dunlap and Arnold answered the petition, justifying the levy of the executions on Cynthia, and insisted that she was subject to Stephen's debts, and denying that it was the intention of the grantor, Kyler, to place Cynthia under the plaintiff, Stephen, as a wife merely, and not as property; that Stephen did not merely take a naked title to Cynthia upon trusts, recognizing the right to freedom in her, or the enjoyment of the rights of a free woman. They also state that Stephen held her as property, upon the terms of the deed of gift, which he had accepted.

We do not deem it necessary to examine or comment upon all the grounds assumed by the counsel of Stephen and Cynthia, as we apprehend the claim to her exemption from the debts mentioned in the executions levied upon her must turn upon the effect of the deed from Joseph Kyler to Stephen.

We remark, that the deed is an absolute one upon its face, and passed the title in Cynthia to Stephen and by the laws of Kentucky slaves are subject to execution for the debts of their owner, just as any other personal property is subject.

To exempt Cynthia from this category it is insisted that she was held by Stephen not as property, but as a wife merely, under a trust created by parol at the time the deed was made. It is also insisted that it is legal for Stephen to hold his wife by virtue of the 6th section of article 1, chapter 93, title slaves, &c., Revised Statutes, page 628. That section is in these words: "No free negro shall be capable of acquir-'ing. in fee, or holding or owning for any length of 'time, as hirer, or otherwise, any slave, other than 'the husband, wife, parent, or descendant of such free 'negro."

*1. By the Rev. Stat. art. 1, chap. 93, page 628, free negroes cannot hold in fee, or for any length of time as hirer, any slave, "other than the husband, wife, parent, or descendant of such free negro."*

This section evidently was never intended to protect slave property from execution; it only permits free negroes to have an interest and property in certain relatives, but expressly prohibits them from acquiring in fee, holding, or owning, for any length of time as hirer or otherwise, any slave, other than . the husband, wife, parent, or descendant of such free negro.

*2. The wife of a free negro is liable to sale under execution against the husband for his debts.*

Article 10, section 1, of the Constitution of Kentucky, speaking of the general assembly, among other things says, "they shall pass laws to permit owners of 'slaves to emancipate them, saving the rights of cred-'itors, and to prevent them from remaining in this 'state after they are emancipated."

Article 10, title slaves, &c., Revised Statutes, page 643, reads as follows:

"Section 1. Slaves may be emancipated by the owners in fee thereof, in the following manner, and upon the following conditions, *and not otherwise*:

' 1. By deed, acknowledged or proved by two sub-' scribing witnesses, in the county court.

' 2. By last will and testament.

' 3. Subject to the debts and liabilities of the ' owners.

' 4. Upon condition of their being removed from, ' and continued residence out of the State of Ken-' tucky.

' 5. The deed of emancipation, and so much of ' any will as emancipates a slave, shall not vest ' the absolute right of freedom in the slave, until ' after he shall have *removed out of the State*."

The latter clause of the 12*th* *section of chapter* 21, *title Construction of Statutes*, *Revised Statutes*, *page* 190, among other things contains these words: "A word ' importing the masculine gender only, may extend ' and be applied to females as well as males"

These extracts are made from the statutes of Kentucky to show that Cynthia has not been emancipated according to the laws of this state, and that any attempt to do so, by a pretended sale of her to her husband, to be held by him only as his wife, is a mere attempt to evade the statutes of this commonwealth on the subject of free negroes, and obviously at war with the policy of the laws of this commonwealth.

The assumption that Stephen Kyler took Cynthia as a wife only, and held the title to her in trust, cannot be maintained. Who was the *cestui que trust*. Not Joseph Kyler or his personal or *legal* representatives. It is not pretended that they are to be benefitted by the supposed trust.

Could Cynthia assert that she was the beneficiary of the trust? Certainly not, if she was a slave, for a slave cannot be a beneficiary under a will or deed, whilst he or she remains a slave.

That Cynthia is a slave we have no doubt whatever, and there is a little room to doubt that Stephen took the absolute fee simple title to her as property, and as his slave by the deed referred to in the pleadings of the parties. The deed is absolute on its face, and conveys the fee simple title to Cynthia, reserving the use of her to the grantor for life.

We have seen that Cynthia is a slave, and although the laws of this state give a recognition to marriages between free negroes, yet marriages between free negroes and slaves is not recognized but to very limited extent.

It is now contended by Stephen and Cynthia, that Cynthia, if a slave, was not subject to execution emanating from the office of a justice of the peace. By our statutes slaves are declared personal property, and we know of no provision in any statute which prohibits a constable from levying an execution upon and selling slaves. The 25*th section in the Civil Code of Practice* is relied upon by appellants counsel, to show that slaves are not subject to executions emanating from a justice's office.

We think this section has no application to executions. It only intends to prohibit the title of real property or slaves, being affected by judgments or orders of Justices courts, or other courts of like inferior jurisdiction.

We are of opinion that the circuit court properly dissolved appellants injunction, and dismissed their petition with costs.

Upon an attentive examination of the record we have not been able to perceive any error, to the prejudice of appellants, wherefore the judgment of the circuit court is affirmed.